**ABBOTT LABORATORIES,**
**Plaintiff–Appellant,**

**v.**

**McLAREN GENERAL HOSPITAL,**
**Defendant–Appellee,**

**Hospital Purchasing Service of Michigan, Intervening Defendant–Appellee.**

**No. 89–2318.**

United States Court of Appeals, Sixth Circuit.

Argued Oct. 1, 1990.

Decided Nov. 16, 1990.

Kathleen McCree Lewis, Dykema, Gossett, Spencer, Goodnow & Trigg, Detroit, Mich. and Mark H. Sutton (argued), Dykema, Gossett, Spencer, Goodnow & Trigg, Bloomfield Hills, Mich., for plaintiff-appellant.

John P. Siler (argued), Bellairs, Dean, Cooley, Siler & Moulton, Flint, Mich., for defendant-appellee.

Rodney L. Schermer, Scholten, Fant & Marquis, Grand Haven, Mich. and Larry Sanders, Holland, Mich., for intervenor-appellee.

Before NELSON and NORRIS, Circuit Judges, and EDWARDS, Senior Circuit Judge.

DAVID A. NELSON, Circuit Judge.

This is an appeal from a summary judgment in favor of a hospital that was sued for an alleged breach of a requirements contract. The central issue is whether the intervening defendant, a purchasing service that negotiated group prices for its member hospitals, had authority to act as agent of the defendant hospital in issuing a cancellation notice to the plaintiff supplier. On the basis of facts that were essentially undisputed, the district court concluded that such authority did exist and that the requirements contract had been effectively cancelled. We agree, and we shall affirm the judgment.

## I

Effective April 1, 1982, the intervening defendant, Hospital Purchasing Service of Michigan ("HPS"), a non-profit corporation owned by a consortium of member hospitals, signed a four-year group contract with plaintiff Abbott Laboratories. This contract, styled the "Large Volume Parenteral Solution and Administration Equipment Contract," established prices for intravenous ("IV") fluids and related products used by HPS's participating hospitals.

The prices established under the contract were to be held firm for 12–month periods, with the parties agreeing to meet with each other by February 1 of each year, at the latest, to discuss pricing for the upcoming contract year. "This," the contract recited, "will allow both parties to discuss and agree upon a price increase that is commensurate with current market conditions." The contract further provided that an individual participating hospital could cancel its participation as of any anniversary date, if the cancellation were preceded by 60 days' written notice.

The group contract, which specified that it represented "the sole agreement with Abbott ... for each eligible Group member electing to participate," also provided that "member hospitals must execute individual contracts agreeing to the terms and conditions contained in this Group contract...." Defendant McLaren General Hospital, Inc., one of the member-owners of HPS, executed such an individual contract with Abbott Laboratories in 1983.

McLaren Hospital's contract, which was scheduled to run through March of 1986, committed the hospital to purchase specified minimum amounts of specified IV products on the terms and conditions set forth in the group contract. Like the group contract, this individual contract provided for termination as of any anniversary date, subject to a requirement for sixty days' advance written notice.

In June of 1985 HPS accepted a proposal by Abbott Laboratories for extending the group contract through March of 1988. As an inducement for this extension, Abbott Laboratories offered price reductions averaging about six percent. The Abbott Laboratories proposal also said that

"For all member hospitals that sign the appropriate contractual extension sub-agreement by July 12, 1985, we agree to retroactively credit all purchases, between March 1, 1985 and June 30, 1985, the difference between current and new contract pricing."

Under date of June 3, 1985, McLaren Hospital signed the "contractual extension sub-agreement" out of which this lawsuit arises. The new sub-agreement, which superceded that signed in 1983, obligated McLaren Hospital to purchase 95 percent of its total requirements for specified IV solutions and related equipment from Abbott Laboratories. The term of the new sub-agreement was from July 1, 1985 to April 1, 1988.

Unlike its predecessor, the new sub-agreement did not expressly address the subject of termination. It did make reference to the group contract, however, specifying that "[t]he terms and conditions of sale not specifically covered by this [sub-]contract ... are contained in the Hospital Purchasing Service of Michigan/Abbott Laboratories Large Volume Parenteral Solution and Administration Equipment contract...." The termination provisions of the group contract, it may be important to note, are set forth in that contract under the heading "Terms and Conditions of Sale."

Early in January of 1986, at about the time of the annual price negotiations, the Assistant Director of HPS, a man named Jerry Welsh, made a telephone call to Terrance McCarthy, the Director of Materials Management Services at McLaren Hospital. Subsequent deposition testimony, which has not been contradicted in any way, establishes that Mr. Welsh reported that HPS was going to send Abbott Laboratories a 60–day notice of intent to cancel the contract on behalf of the HPS membership. Mr. Welsh cited "competitive market conditions" in explaining the need for such a notice.

The notice was sent to Abbott Laboratories on January 22, 1986. Addressed to the manager of Abbott Laboratories' "Major Accounts Hospital Products Contract Pricing" unit, and signed by the President of HPS, it read as follows:

"According to the terms and conditions of the HPS/Abbott Agreement ... we hereby are providing your office with our formal 60 day notification of cancellation. *This notice is being submitted* at the direction of the HPS Pharmacy Advisory Committee *on behalf of the HPS membership.* Because all individual member agreements are strictly tied to the master agreement, the eventual potential cancellation of the master agreement would have the corresponding effect upon the individual agreements.

This action is being taken under the terms and condition of the current contract to assure ourselves the opportunity to review the market prior to the next commitment year." (Emphasis supplied.)

Although Mr. McCarthy had not authorized HPS to send the notice, he testified that he felt no obligation to do so because he felt that HPS had authority to act on the hospital's behalf. He also testified that immediately after the telephone conversation in which he learned what HPS was planning to do, he contacted Miss Cleo Silver, his direct superior at the hospital. Miss Silver was Vice–President of Nursing Services, Mr. McCarthy testified, and she would have to be involved in any decision to change IV solution suppliers. Neither Mr. McCarthy or Miss Silver instructed HPS not to send a cancellation notice for McLaren Hospital.

When Abbott Laboratories received the notice in January, it raised no question about HPS's authority to do what it was purporting to do on behalf of its members. On the contrary, a Vice–President of Abbott Laboratories sent the President of HPS a cordial letter thanking him for having taken the time to meet with Abbott Laboratories recently and stating "I realize that HPS must fully evaluate its alternatives and chose a path that seems most appropriate for its membership."

Not until March 20, 1986—long after the 60–day deadline had passed—did Abbott Laboratories send HPS a letter challenging the authority of HPS to terminate contracts on behalf of its membership. Because "the contract language is clear and unequivocal in providing the right of termination to the individual participating hospitals," this letter asserted, "your notice of termination dated January 22, 1986 is void and of no force and effect."

McLaren Hospital did not share that view,[1] so when HPS failed to work out satisfactory price arrangements with Abbott Laboratories, the hospital switched suppliers. This lawsuit followed; Abbott Laboratories sued McLaren Hospital in the United States District Court for the Eastern District of Michigan, invoking the court's diversity jurisdiction. The complaint asked for specific performance, damages, and a declaratory judgment to the effect that the cancellation letter of January 22, 1986, did not operate as a valid termination of the individual hospital contract or of the group contract. There was no request for a jury trial.

After HPS had intervened as a defendant, both sides moved for summary judgment. On consideration of the material filed in support of the motions, and following oral argument, the district court (Newblatt, J.) found that HPS had been acting as the hospital's agent when it gave the notice of termination on January 22. The court therefore granted the defendants' motion for summary judgment and denied the plaintiff's. Abbott Laboratories has perfected a timely appeal.

## II

■ Whether HPS was McLaren Hospital's agent for the purpose of giving notice of termination depends on the intention of

---

**1.** By letter of May 6, 1986, Mr. McCarthy advised one of Abbott Laboratories' lawyers that "[w]e at McLaren General Hospital confirm that HPS has represented its membership in notifying Abbott Laboratories in their letter dated January 22, 1986 of a sixty (60) day advance notice of termination on behalf of their membership."

the parties, as evidenced by their acts or agreements. *Van Pelt v. Paull,* 6 Mich. App. 618, 150 N.W.2d 185 (1967). In attempting to ascertain what the parties seem to have intended, Abbot Laboratories argues with some cogency, the focus of the courts must be on the actions of the principal. If the agent is off on a frolic of its own, in a situation where the principal has neither given the agent authority to act for it nor done anything to suggest to others that the agent has such authority, and in the absence of ratification, courts do not ordinarily treat the act of the agent as the act of the principal.

■ McLaren Hospital did not expressly authorize HPS to issue a termination notice on the hospital's behalf. But we think the conclusion is inescapable that the hospital gave such authorization by implication. HPS having told the hospital that a termination notice was going to be issued on behalf of the membership, the hospital should have spoken up if it did not want a notice sent on its behalf.

The nature and history of the parties' relationship is important in this connection. For years, McLaren Hospital had been relying on HPS to negotiate favorable supply arrangements for it. It was HPS that negotiated the group contract with Abbott Laboratories on behalf of the member hospitals. It was HPS that negotiated the wording of commitment agreements subsequently signed by individual hospitals. And it was HPS, acting on behalf of its membership, that conducted the annual negotiations with Abbott Laboratories over pricing.

There can be no question at all about the authority of HPS to negotiate price terms for its members—and the notice of termination was, of course, intimately connected with the price negotiations. This comes through very clearly in the second paragraph of the notice, where HPS explained that its reason for giving "formal" notification of cancellation was "to assure our-selves the opportunity to review the market prior to the next commitment year."

Abbott Laboratories understood, as its contemporaneous letter to HPS acknowledges, that HPS was evaluating its alternatives in light of market conditions. McLaren Hospital likewise understood that it was "competitive market conditions"—prices available from competing suppliers, in other words—that prompted HPS to propose sending the termination notice. When McLaren Hospital acquiesced in that proposal, it was acquiescing in a move that would strengthen HPS's bargaining position with Abbott Laboratories and would help assure that the member hospitals got their supplies at the lowest possible prices. Given the purpose for which HPS had been formed, it is hardly surprising that McLaren Hospital should have allowed HPS to give such a notice on its behalf.

Abbott Laboratories had every reason to suppose that HPS was telling the truth when it said that it was acting "on behalf of the HPS membership." And if Abbott Laboratories intended to challenge HPS's authority to act for the hospitals, it should have done so in time for the hospitals to act for themselves if necessary.[2] As we have seen, Abbott Laboratories did nothing until it was too late for McLaren Hospital to have one of its own officers or employees sign a termination notice.

One way of testing our conclusion as to the effectiveness of the HPS notice would be to see whether the notice would have been binding on McLaren Hospital if Abbott Laboratories had wanted to stop selling to the hospital after April 1, 1986. Although Mr. McCarthy's testimony makes it clear that his boss, Miss Silver, might have been upset if she had been forced to change suppliers on that date, the fact remains that Miss Silver—an officer of the hospital—knew that HPS was planning to give a termination notice on behalf of her institution and knew that a product change might be in the offing as a result. She neither stopped the notice from being sent

---

**2.** Other hospitals did send individual cancellation notices to Abbott Laboratories, but the record does not indicate that they did so be-cause Abbott Laboratories had questioned HPS's authority in any way.

nor advised Abbott Laboratories that the notice would not be effective as to her hospital. Under these circumstances, we believe, there is no lack of mutuality; the hospital could no more have insisted that Abbott Laboratories continue making sales to it after April 1 than Abbott Laboratories could insist that the hospital continue making purchases after that date.

We note, finally, that because of the somewhat peculiar wording of the group contract, there is a certain lack of precision in the wording of the termination notice. What is terminable in the group contract is not the contract itself, but individual member hospitals' "participation" in the contract. The notice speaks of the potential cancellation of the master agreement. This minor slip is of no consequence; if all of HPS's member hospitals terminated their participation in the group contract—and HPS was purporting to act on behalf of its entire membership, it will be recalled—there would be nothing left of the group contract. And without a group contract, agreements signed by the individual hospitals would be meaningless.

It was the group contract that specified prices, among other things, and without a price term, the individual sub-agreements could not be enforced. "Because all individual member agreements are strictly tied to the master agreement," as the termination notice explained, "... cancellation of the master agreement would have the corresponding effect upon the individual agreements." Although the individual sub-agreement signed by McLaren Hospital in 1985 did not have an express termination clause, termination of the hospital's participation in the group contract would render the sub-agreement a nullity.

Abbott Laboratories' letter of March 20, 1986, might perhaps be read as suggesting that member hospitals could terminate their participation in the group contract only by individual notices signed on their behalf by officers or employees of the individual hospitals, rather than by a collective notice signed on their behalf by an officer of HPS. Such a suggestion would be wrong; there is no reason at all why the jointly-owned entity through which the hospitals chose to negotiate prices could not have been authorized to terminate the hospitals' participation in a contract no longer thought to be price-competitive.

After a careful review of the record, Judge Newblatt concluded that "the parties' conduct supports an actual agency, the economic basis for the relationship supports the agency, sensible timing supports the agency, and general estoppel principles based on common equity and fairness support the existence of an actual agency." We agree. The judgment of the district court is AFFIRMED.